# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued April 16, 2021          Decided June 4, 2021

No. 20-1234

TELESAT CANADA, ET AL.,
PETITIONERS

v.

FEDERAL COMMUNICATIONS COMMISSION AND UNITED
STATES OF AMERICA,
RESPONDENTS

———

On Petition for Review of an Order
of the Federal Communications Commission

———

*W. Kenneth Ferree* argued the cause for petitioners. With him on the briefs were *Henry Goldberg*, *Joseph A. Godles*, *Carlos M. Nalda*, *Bruce Henoch*, *David S. Keir*, and *Brennan Price.*

*Pamela L. Smith*, Counsel, Federal Communications Commission, argued the cause for respondents. With her on the brief were *Michael F. Murray*, Deputy Assistant Attorney General, U.S. Department of Justice, *Robert B. Nicholson* and *Matthew C. Mandelberg*, Attorneys, *Thomas M. Johnson, Jr.*, General Counsel, Federal Communications Commission, *Ashley S. Boizelle*, Deputy General Counsel, and *Jacob M. Lewis*, Associate General Counsel. *Richard K. Welch*, Deputy

Associate General Counsel, Federal Communications Commission, entered an appearance.

Before: TATEL, *Circuit Judge*, and SILBERMAN and SENTELLE, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* SILBERMAN.

SILBERMAN, *Senior Circuit Judge*: This case deals with the question whether the FCC can charge foreign satellite operators with U.S. market access the same regulatory fees that their American licensed competitive counterparts pay. The FCC, reversing a long-held position, concluded by rule that the foreign satellite operators (Petitioners) must pay these fees. We deny the petition for review.

# I

Congress, in 1993, amended the Communications Act to require the Commission to assess and collect regulatory fees to recover the costs of its various activities.[1] Congress set an initial schedule of fees that apply "until amended by the Commission." "Space stations" (i.e., satellites) were included in the schedule but there were blanket exceptions for "governmental entities or nonprofit entities" and for "amateur radio operator[s]."

Initially, the Commission limited regulatory fees to those entities licensed by the Commission—which did not (and does

---

[1] *Omnibus Budget Reconciliation Act of 1993*, Pub. L. No. 103-66, § 6003, 107 Stat 312, 397 (1993) (codified at 47 U.S.C. § 159 (1994)).

not) include foreign-licensed satellites.[2] The Commission relied on a passage incorporated into the Conference Report for the 1993 Act—on which Petitioners now rely—which states:

> The Committee intends that fees in this category be assessed on operators of U.S. facilities, consistent with FCC jurisdiction. *Therefore, these fees will apply only to space stations directly licensed by the Commission under Title III of the Communications Act.* Fees will not be applied to space stations operated by international organizations subject to the International Organizations Immunities Act.[3]

The Commission consistently reasserted this view until 2013, when it expressed doubts on "whether regulatory fees should be assessed on non-U.S. licensed space station operators providing service in the United States." The FCC invited comment on its previous conclusion whether "the regulatory fee category for space stations . . . covers only Title III license

---

[2] *Assessment and Collection of Regulatory Fees for Fiscal Year 1995,* Report and Order, 10 FCC Rcd. 13512, 13549–51 (1995). Cable television services, which are not licensed by the FCC, were also charged regulatory fees.

[3] H.R. Rep. No. 207, 102d Cong., 1st Sess. 26 (1991) (emphasis added). The Conference Report incorporates by reference this language from the House Committee Report. H. Conf. Rep. No. 213, 103d Cong., 1st Sess. 499 (1993) ("To the extent applicable, the appropriate provisions of the House Report (H.R. 102-207) are incorporated herein by reference.").

holders."[4] But the Commission declined to decide the issue, stating additional time was needed for further consideration.

In 2018, as part of the so-called Ray Baum's Act, Congress again amended Section 9 of the Communications Act.[5] Congress changed the Commission's authority to adjust the fee schedule based on the number of "units" (that is, satellites) subject to the payment of fees rather than either the number of units or licensees.[6] It also added the power to adjust fees based on factors "reasonably related to the benefits provided to the payor of the fee by the Commission's activities."[7] And another fee exemption was added for "noncommercial radio station[s] or noncommercial television station[s]."[8]

In 2019, the Commission again sought "comment on whether [the Commission] should or must assess regulatory fees on non-U.S. licensed space stations serving the United States under section 9."[9] The FCC recognized that it previously

---

[4] Notice of Proposed Rulemaking, 28 FCC Rcd. 7790, 7809 ¶ 49 (2013).

[5] *Ray Baum's Act of 2018*, Pub. L. No. 115-141, 132 Stat. 348 Division P, Title I, § 102 (2018) (codified at 47 U.S.C. § 159).

[6] *Compare* 47 U.S.C. § 159(b)(2)(A) (1994), *with* 47 U.S.C. § 159(c)(1)(A) (2018).

[7] *Compare* 47 U.S.C. § 159(b)(2)–(3) (1994), *with* 47 U.S.C. § 159(d) (2018).

[8] *Compare* 47 U.S.C. § 159(h) (1994), *with* 47 U.S.C. § 159(e) (2018).

[9] Notice of Proposed Rulemaking, 34 FCC Rcd. 8189, 8213 ¶¶ 62–65 (2019) (hereinafter, "*Notice*").

declined to assess fees on non-U.S. licensed space stations. However, it noted that in 2013 it had started to reevaluate that position.

The FCC "observe[d]" that the Ray Baum's Act "requires the Commission to consider increases and decreases in the 'number of units' subject to payment of regulatory fees, but does not state 'licensees,'" and that language appears equally applicable to the U.S.- and foreign-licensed satellites. The Commission noted that foreign-licensed space stations that serve U.S. customers benefit in the same manner as their U.S.-licensed competitors. Considering these benefits, the FCC asked whether it was fair or equitable to maintain the exemption.

In the *Order* (actually a rule) before us, the Commission concluded it could adopt regulatory fees for non-U.S. licensed space stations with U.S. market access.[10] The Commission did not rely on the Ray Baum's Act's use of the term units rather than licensees. Instead, the Commission reasoned that the statutory text did not foreclose its reading, since the statute contemplates fees that reflect "benefits provided to the payor of the fee by the Commission's activities." *Order* ¶ 10 (quoting 47 U.S.C. § 159(d)). And, although the text includes some explicit exemptions from regulatory fees, none exempt non-U.S. licensed space stations with U.S. market access. *Id.*

The Commission thought, based on policy considerations, it should impose regulatory fees on non-U.S. licensed space stations that have been granted access to the U.S. market. *Id.* ¶¶ 19–27. Foreign-licensed satellite operators must petition the FCC to access the U.S. market. The FCC explained that it

---

[10] Report and Order, 35 FCC Rcd. 4976, 4980–81 ¶ 10 (2020) (hereinafter, "*Order*"); *see also id.* ¶¶ 9–34.

devotes significant resources to processing the growing number of such petitions. Foreign-licensed satellites benefit from the Commission's oversight and regulation in the same manner as U.S. licensed satellites. *Id.* ¶ 21. And processing a petition for market access, according to the Commission, "requires evaluation of the same legal and technical information as required of U.S. licensed applicants." *Id.* The current exemption "places the burden of regulatory fees . . . solely on the shoulders of U.S. licensees." *Id.* ¶ 26. Therefore, assessing the same regulatory fees on foreign-licensed space stations with market access would better reflect the benefits received by these operators and promote regulatory parity. *Id.*

The Commission frankly acknowledged its previous position that foreign-licensed space stations were exempt based on the Conference Report but concluded that the Report was not relevant. The Commission explained that commercial foreign-licensed satellites with general U.S. market access did not exist until 1997. *Id.* ¶ 15. Only then did the Commission adopt a formal process "for granting market access to non-U.S. licensed space stations." *Id.* ¶ 16. Therefore, the Report actually focused on Intelsat and Inmarsat—two "treaty-based international governmental organizations," that provided most satellite services to the U.S. market at that time. *Id.* ¶ 15–16. The market has since changed: Intelsat and Inmarsat are no longer international governmental organizations, but commercial enterprises, and there are many foreign-licensed satellite operators—including Petitioners—that compete with U.S.-licensed satellite operators in the U.S. market. *Id.* ¶ 17.

## II

Petitioners' primary argument is based not on the text of the Communications Act, but rather the Conference Report, which, as we noted, explicitly states that "fees will apply only

to space stations directly licensed by the Commission." But the statute, as will be recalled, provides a general guide to the FCC that it should charge regulatory fees to those who benefit from its regulations. It is undeniable that foreign satellites and their operators that serve the United States do benefit from the Commission's regulation in much the same way as their U.S.-licensed counterparts. The Commission creates a fair and safe environment for all U.S. market participants by, among other things, minimizing the risks of radio interference and mitigating the danger of orbital debris. *Order* ¶ 21. The Commission reviews petitions for market access by foreign-licensed satellites to ensure legal and compliance with this carefully coordinated system. *Id.*

Moreover, the Act as amended explicitly excludes from regulatory fees only four categories: (1) government entities, (2) non-profit entities, (3) amateur operators and (4) non-commercial radio and TV stations. Petitioners do not fit into these exceptions.

To be sure, as Petitioners emphasize, there are a number of other "entities" which gain the benefit of FCC regulations—such as TV networks, internet service providers, and consumers—that are not charged regulatory fees. Petitioners argue that makes the statute "ambiguous" with regard to which beneficiaries may be charged regulatory fees. Therefore, one must go to the legislative history (the Conference Report) to reconcile the ambiguity (or, to put it more accurately, to fill the statutory "gap"—the failure to specify whether non-licensee beneficiaries may be charged fees*, see Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984)). Petitioners argue that the Conference Report explains that, at least for satellites, only those that are licensed by the Commission may be charged regulatory fees.

8

The problem with Petitioners' argument is the Report reads as a freestanding statement—it is not directed to any particular statutory language. As we have said in a previous case, "there is no obvious hook" in the text of the statute on which to hang any exemption or other limitation found in the Report. *PanAmSat Corp. v. FCC*, 198 F.3d 890, 895 (D.C. Cir. 1999).[11] And the Report cannot be said to clarify the term "space station" as used in the fee schedule (assuming its ambiguity), because the Report addresses the applicability of fees rather than providing a definition. Although we sometimes—cautiously—look at legislative history to guide interpretation of ambiguous statutory language, it has to be history that can be said to be directed to the ambiguity in a statute. That is not true here.

Even if one looks to the Conference Report, we think it is hardly pellucid. The second sentence, on which Petitioners rely—"Therefore, these [regulatory] fees will apply only to space stations directly licensed by the Commission"—can be interpreted in connection with the third sentence— "Fees will not be applied to space stations operated by international organizations subject to the International Organizations Immunities Act." The third sentence can be read as an explanation of the second sentence. In other words, the entities excluded by the second sentence are specifically identified in the third. Otherwise, the third sentence would be surplusage.

---

[11] In *PanAmSat*, the FCC had concluded, erroneously we thought, that Comsat (an American company involved in launching international satellites) was legally entitled to an exception because of the Conference Report. We remanded to the FCC to reconsider their position without regard to the Conference Report. 198 F.3d at 895.

This reading supports the Commission's policy determination. As it stressed, there was a "very different marketplace and regulatory environment" at the time of the Conference Report. It was focused on intergovernmental—not foreign-licensed—satellites. *Order* ¶¶ 15–17. At that time, foreign-licensed space station operators only had a "very limited provision of service[s]" and even that depended "upon a showing that existing U.S. domestic satellite capacity was inadequate to satisfy specific service requirements." *Id.* Approval for this limited market access was obtained on a "case-by-case" basis after "bilateral, government to government" discussions. *Order* ¶ 17. It was only after 1997 that foreign-licensed space stations could provide general commercial services in the United States.[12] When the Conference Report was written, the relevant category of satellites—foreign-licensed commercial satellites with general U.S. market access—simply didn't exist. Thus, Congress was unlikely to have contemplated the type of satellites at issue in this case.

Petitioners make much of the fact that some foreign-licensed satellites were serving the U.S. market prior to the Conference Report. But as the Commission notes and Petitioners do not dispute—such services were limited in scope and *ad hoc* until 1997. So the Commission reasonably concludes that Congress was not focused on foreign-licensed satellites.

Still, Petitioners argue that even if the Commission's reading would have been legitimate if announced initially, its contrary reading had been ratified by Congress both implicitly and explicitly. Between 1993 and the 2018 Ray Baum's Act,

---

[12] *DISCO II Order*, 12 FCC Rcd. 24094 (1997); 47 C.F.R. § 25.137.

Congress repeatedly had the opportunity to address Section 9 fees through its annual budget process, but never questioned the FCC's conclusion that its Section 9 authority is coterminous with its Title III licensing authority. Thus, according to Petitioners, this case fits within the proposition that "the practical construction given to an act of Congress, fairly susceptible of different constructions, by those charged with the duty of executing it is entitled to great respect and, if acted upon for a number of years, will not be disturbed except for cogent reasons." *Udall v. Tallman*, 380 U.S. 1, 18 (1965) (quoting *McLaren v. Fleischer*, 256 U.S. 477, 481 (1921)).

But, as the Commission correctly observes, Congressional silence does not imply acquiescence absent additional indications of ratification. *See Boys Markets, Inc. v. Retail Clerks Union, Local 770*, 398 U.S. 235, 241–42 (1970). Even an undisputed 25-year-old agency interpretation does not graduate into a statute through mere Congressional inaction. *See Cape Cod Hospital v. Sebelius*, 630 F.3d 203, 214 (D.C. Cir. 2011).

Petitioners' claim that the Ray Baum's Act explicitly ratified the Commission's policy is also wide of the mark. Petitioners contend that Congress reenacted the Section 9 fee schedule, including the "space station" category which the Commission long interpreted to exclude foreign-licensed satellites. This, Petitioners assert, triggers the rule that the reenactment of a statute presumptively adopts the Commission's prior interpretation. *See Alexander v. Sandoval*, 478 U.S. 833, 846 (1986) ("[W]hen Congress revisits a statute giving rise to a longstanding administrative interpretation without pertinent change, the congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress.") (internal quotation omitted).

The Commission persuasively responds that Congress' reenactment of the fee schedule does not fit the *Sandoval* test. The Ray Baum's Act merely provided that the regulatory fees established under Section 9 of the Communications Act "shall remain in effect . . . until such time as the Commission adjusts or amends such fee under subsection (c) or (d) . . . ."[13] Rather than endorsing the Commission's prior interpretation of Section 9, the Act notes that the Commission retains flexibility to adjust or amend regulatory fees—which the Commission then did in the *Order*. *Id.* ¶ 34 (noting the *Order* is an amendment to the fee schedule under Section 9(d)); *see also* 47 U.S.C. § 159(d).

The Ray Baum's Act's other changes to Section 9 support this conclusion. As we noted, Congress made clear that the Commission's regulatory fee schedule should take account of "the benefits provided to the payor of the fee by the Commission's activities." 47 U.S.C. § 159(d). This suggests benefits—not licenses—should be the touchstone for whether it is reasonable for the FCC to collect regulatory fees. And—critically—Congress added a category of entities to the list of those statutorily exempt from regulatory fees, 47 U.S.C. § 159(e)(1)(C) (noncommercial radio and television stations), but did not add an exemption for foreign-licensed space stations with U.S. market access.

\* \* \*

Petitioners' alternative argument is that the Commission's *Notice* was defective because it failed to specify the relevant legal theory that supported the *Order*. The *Order* was an improper surprise that avoided pertinent commentary because the *Notice* was directed to the Ray Baum's Act. That, according

---

[13] Pub. L. 115-141, Division P, Title I, § 102(d)(2), 132 Stat. 1086 (2018).

to Petitioners, was the only legal basis suggested that would authorize the Commission's *volte face*.

First, we note that the Commission met the APA's requirement in § 553(b)(2) by referencing the relevant legal authority. It clearly identified the basic governing statute as well as the Communications Act and its 2018 amendment. *See Nat'l Tour Brokers Ass'n v. United States*, 591 F.2d 896, 900 (D.C. Cir. 1978). A notice need not explicate a rule's final legal theory. *See, e.g., Koretoff v. Vilsack*, 707 F.3d 394, 398 (D.C. Cir. 2013) (holding that even final rules need not comprehensively explain relevant legal theories).

Turning to the logical outgrowth test, "we ask ourselves, would a reasonable member of the regulated class . . . anticipate" the general aspects of the rule. *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1107, 1109 (D.C. Cir. 2014). The Commission certainly foreshadowed that it was reaching, indeed had been repeatedly reaching, for a legal theory that would justify switching its initial position that the statute precluded charging foreign satellites fees. After all, the *Notice* specifically asked whether the Commission "should or must assess regulatory fees on non-U.S. licensed space stations serving the United States" and even referenced the Commission's 2013 and 2014 requests for comment on the issue.

\*   \*   \*

In sum, Petitioners have not shown that the Commission unreasonably interpreted Section 9 of the Communications Act

or provided inadequate notice of the *Order*. We therefore deny the petition.[14]

*So ordered.*

---

[14] In addition to the foregoing arguments, Petitioners have made a number of other and subsidiary arguments which we have considered and reject without written opinion.